JAMES H. McCLINTOCK ET AL. *v.* RENE R. RIVARD ET AL.
(14009)

PETERS, C. J., CALLAHAN, GLASS, COVELLO and BORDEN, Js.

Argued April 23—decision released July 9, 1991

*Walter A. Twachtman, Jr.,* for the appellants (plaintiffs).

*Bruce J. Comollo,* for the appellees (defendants).

BORDEN, J. The plaintiffs, James H. McClintock and Mary J. McClintock, brought this action for specific performance and damages against the defendants, Rene R. Rivard and Jenney T. Rivard, for failure to purchase certain real property from the plaintiffs pursuant to a contract. The defendants filed a counterclaim. The trial court rendered judgment and awarded damages on the plaintiffs' complaint, and found for the plaintiffs on the defendants' counterclaim. The plaintiffs appealed to the Appellate Court and we transferred the appeal to this court pursuant to Practice Book § 4023.

The plaintiffs claim that the trial court: (1) should have found certain facts that were either admitted or undisputed; (2) improperly rejected their claims of fraudulent and negligent misrepresentation; and (3) improperly calculated the award of damages.[1] We affirm.

The material facts are as follows. On July 2, 1988, the plaintiffs and the defendants executed a contract for the sale of real property located at 223 Woodfield Crossing, Rocky Hill, for $265,000. The agreement provided that the closing would take place on September 30, 1988. The defendants agreed to pay specified deposits in advance of the closing and the agreement stipulated that if the defendants defaulted and the plaintiffs were not in default, the defendants' deposits would be retained by the plaintiffs as liquidated damages.

The defendants paid the plaintiffs $500 as a deposit, as agreed. The defendants failed, however, to pay an additional deposit in the amount of $9500 on or before July 12, 1988, as required by the agreement. The plaintiffs accepted, in lieu thereof, $5500 in cash and a promissory note for $4500 to be paid at or before the closing.

The contract also contained a mortgage contingency clause, whereby the defendants had the right to terminate the agreement on or before August 1, 1988, if they were unable to obtain a mortgage to finance their purchase of the plaintiffs' property. On July 21, 1988, the defendants received a mortgage commitment from the Dime Savings Bank (Dime) in the amount of $140,000[2] and, thus, the mortgage contingency period

---

[1] The plaintiffs do not challenge on appeal the trial court's failure to award specific performance of the contract.

[2] Dime subsequently increased the amount of this commitment to $160,000.

expired without an exercise by the defendants of their right to terminate the agreement. When the plaintiffs pointed out to the defendants that the mortgage commitment agreement from Dime provided that the commitment was conditioned upon the sale of the defendants' existing home, the defendants, having overlooked the pertinent provision, inquired about the condition with a representative of Dime. The representative informed the defendants that it was standard practice to use a preprinted mortgage commitment form, which contained a prior sale condition, but assured them that Dime would not enforce the condition in their case. The defendants related the substance of this conversation to the plaintiffs.

After receiving the mortgage commitment, the defendants sought to obtain a bridge loan, which they needed in order to purchase the plaintiffs' property prior to selling their existing home. The financial institutions that the defendants contacted initially declined to consider the defendants' application for a bridge loan until they had a purchase and sale agreement for their existing home. The defendants informed the plaintiffs that they were having difficulty obtaining interim financing.

In late August, the defendants contacted the Tower Mortgage Company (Tower). Tower's loan officer, Mary Alford, agreed to meet with the defendants and to consider their application for a bridge loan. Because it was Tower's practice in granting a bridge loan to encumber both the existing property and the property to be purchased, at the outset of the application process Alford contacted Bob Hoffman, the originator of the loan at Dime, to ensure that Dime would permit a second mortgage of the purchased property. Hoffman informed Alford that Dime would not permit the second mortgage of the purchased property but that

it would not have a problem with the bridge loan if the purchased property were unaffected. Alford then began trying to secure a bridge loan for the defendants from financial sources other than Tower.

In late September, due to the defendants' inability to close as they initially had intended, the parties agreed to postpone the closing from September 30 until October 21, 1988. Because the plaintiffs had recently moved into a new home with the expectation of closing on September 30, 1988, the defendants agreed to assume the "carrying costs" of the Rocky Hill property that the plaintiffs would incur as a result of the postponement; those costs were estimated at $85.33 per day.[3] This agreement was confirmed in a letter from the plaintiffs' attorney, Joseph Marino, to the defendants' attorney, Walter Sidor, Jr. In mid-October, the parties agreed to postpone the closing until October 31, 1988, and further agreed that the defendants would pay the carrying costs incurred by the plaintiffs until the date of closing. This agreement was confirmed in a second letter from Marino to Sidor.

When Alford's various attempts to obtain financing for the defendants proved unsuccessful, she approached her superior officers at Tower and requested that Tower grant the defendants a bridge loan secured solely by their existing property. The superior officers agreed and on October 28, 1988, Tower drafted a mortgage commitment letter.

October 31, 1988, passed, but the closing did not occur. Thereafter, the parties agreed to extend the closing until December 1, 1988. In addition, the defendants

---

[3] The plaintiffs' carrying costs included the following daily expenses associated with ownership of the Rocky Hill property: (1) $35.63 for a first mortgage; (2) $21 for a second mortgage; (3) $27.33 for a bridge loan mortgage; and (4) $1.37 for homeowner's insurance.

agreed to pay the plaintiffs $3400 before November 11, 1988, to cover the carrying costs incurred for the months of October and November. This agreement was memorialized in a third letter from Marino to Sidor.

During the first week of November, Alford informed Hoffman that Tower had drafted a commitment letter for a second mortgage of the defendants' existing home. Hoffman, however, then told Alford that Dime had recently discovered a problem with the defendants' credit[4] and that, therefore, although Dime would still honor its mortgage commitment, it would oppose any further encumbrances of the defendants' existing property. On November 11, 1988, because the defendants were unable to purchase the plaintiffs' property without a bridge loan, Sidor informed Marino that the defendants would not purchase the plaintiffs' property. The plaintiffs ultimately sold the Rocky Hill house to another purchaser on November 1, 1989.

The plaintiffs instituted this action against the defendants, seeking specific performance and monetary damages. The plaintiffs' complaint set forth four counts as follows: (1) breach of contract; (2) fraudulent misrepresentation; (3) negligent misrepresentation; and (4) failure to pay a promissory note. The defendants denied the plaintiffs' claims and, by way of special defense, claimed that even if the plaintiffs were entitled to damages, the amount of damages recoverable was limited by the liquidated damages provision of the contract. The defendants' counterclaim sought return of their deposit and release of their obligation under the promissory note. The trial court rendered judgment for the plaintiffs on the first and fourth counts of the complaint and on the counterclaim, and rendered judgment

[4] The defendants' credit history revealed a stream of late mortgage payments. The defendants were unaware, however, that the payments had been untimely.

for the defendants on the second and third counts of the complaint. On the motion of the plaintiffs, the trial court subsequently modified the judgment by increasing the award of damages.[5]

## I

The plaintiffs first claim that the trial court should have found certain facts that were either admitted or undisputed. According to the plaintiffs, because the findings were essential to a proper determination of the case, the trial court improperly failed to find certain facts set forth in their trial memorandum.[6] We disagree.

---

[5] In its memorandum of decision on the plaintiffs' motion to open the judgment, the trial court also altered the description of the purchase property. In its earlier memorandum of decision, the trial court had mistakenly described the purchase property as 33 Country Lane, Hebron, the property where the plaintiffs had moved following the execution of the contract for the sale of 223 Woodfield Crossing, Rocky Hill.

[6] The pertinent facts are as follows: "19. The defendant, RENE RIVARD, assured the plaintiffs that the Dime Savings Bank was not going to exercise the contingencies but rather, this was a standard form that they used in all real estate closings and further, he stated that the bank had promised to allow the defendants to 'bridge' money if he could not sell his home. . . .

"23. Based solely on their purchase and sale contract with the defendants which was now without any contingencies, the plaintiffs were able to obtain bridge financing and to close on their new home, all of which was done with the knowledge and approval of the defendants.

"24. The plaintiffs moved into their new home on August 25, 1988, with the expectation of carrying two homes until the closing date scheduled to be September 30, 1988.

"25. The plaintiffs did not hear from the defendants during the first several weeks of September of 1988, and as the closing date approached, they contacted the defendants by telephone.

"26. In late September, a meeting was scheduled at 223 Woodfield Crossing in Rocky Hill at which meeting the defendants told the plaintiffs that they could not close on September 30th but were working on interim financing. . . .

"33. As October 21st neared, a closing was still not scheduled and the plaintiff, MARY J. McCLINTOCK, went to the home of the defendants during the final week of the extension.

"34. The plaintiff, MARY J. McCLINTOCK, told the RIVARDS the financial urgency of the situation and the defendants indicated that they were packing

After the trial court rendered its judgment, the plaintiffs filed a motion to open the judgment, requesting, inter alia, that the trial court find the facts set forth in their trial memorandum. Although the trial court granted the motion, in part, it denied the plaintiffs' request to find the alleged facts. Pursuant to Practice Book § 4051,[7] the plaintiffs filed a motion for articulation, once again requesting that the trial court find the alleged facts. The trial court denied the motion. Pursuant to Practice Book § 4054,[8] the plaintiffs filed

to move and needed just a little more time to work out the interim financing and that they would be willing to close very, very soon. . . .

"38. October 31st came and went and no closing was scheduled or took place.

"39. On November 7th, the plaintiffs had a telephone conversation with the defendants regarding the cash flow problems confronting the plaintiffs since they had been paying on two houses since August of 1988. . . .

"43. The defendants, especially RENE RIVARD, for the entire period up to November 11, 1988, consistently indicated to the plaintiffs that they were financially capable of closing and willing to close and that all they needed was just a little more time to work out their arrangements."

[7] Practice Book § 4051 provides in pertinent part: "A motion for rectification or articulation shall be filed in triplicate with the chief clerk of the supreme court and forwarded by such clerk to the trial judge. The trial judge shall file the ruling on the motion with the chief clerk of the supreme court.

"Any motion seeking corrections in the transcript or the trial court record which depend on proof of matters not of record or seeking an articulation or further articulation of the decision of the trial court shall be determined by the judge of the trial court whence the appeal is taken or the reservation is made. The trial court may make such corrections or additions as are necessary for the proper presentation of the preliminary statement of issues or for the proper presentation of questions reserved; or the trial court may approve a stipulation of counsel that such a correction or addition be made, provided the motion or stipulation is presented before the appeal is ready to be assigned for hearing and only by leave of the supreme court thereafter. The action of the trial judge as regards such a correction or addition may be reviewed by the supreme court under Sec. 4054. Nothing herein is intended to affect the existing practice with respect to opening and correcting judgments and the records on which they are based . . . ."

[8] Practice Book § 4054 provides in pertinent part: "Any party aggrieved by the action of the trial judge as regards rectification of the appeal or artic-

a motion for review of that decision in this court, requesting that this court order the trial court to find the alleged facts. We granted the motion for review but denied the relief requested.

The plaintiffs' claim on appeal, that the trial court should have made certain findings of fact, is identical to the claim raised in their motion for review. The plaintiffs, therefore, for the second time, seek our review of the trial court's denial of their request for articulation. Such a second review is not required except "when plenary review of the case on the merits of the appeal discloses that our earlier decision was ill considered, and that further articulation is necessary for the just determination of the appeal. Cf. *Rostain* v. *Rostain*, 213 Conn. 686, 694–95, 569 A.2d 1126 (1990) (sua sponte remand for articulation)." *State* v. *Holloway*, 22 Conn. App. 265, 276, 577 A.2d 1064, cert. denied, 215 Conn. 819, 576 A.2d 547 (1990).

We conclude that no further review is necessary in the present case. Contrary to the plaintiffs' assertion, explicit findings on their factual allegations are not necessary for this court to review the trial court's determination that the defendants made no fraudulent or negligent misrepresentations. The majority of the factual allegations concern the plaintiffs' claim of reliance on the defendants' representation that they had the financial ability to purchase the property. The defendants, however, did not dispute that the plaintiffs had relied on their representations. Rather, the defendants argued that, in view of the assurances made by Dime and Tower, they had not misrepresented their finan-

ulation under Sec. 4051 may make a written motion for review to the supreme court, to be filed with the chief clerk of the supreme court, and the supreme court may, upon such a motion, direct any action it deems proper . . . ."

cial ability to purchase the property. Consequently, it was unnecessary for the trial court to address the question of the plaintiffs' reliance.

Furthermore, the trial court's memorandum of decision adequately sets forth its factual findings and its conclusions of law in light of those facts. The trial court's decision, therefore, provides an adequate basis for meaningful appellate review without the necessity of further factual findings.

## II

The plaintiffs next claim that the trial court should have determined that the defendants fraudulently or, at the least, negligently misrepresented to the plaintiffs that they had the financial ability to purchase the plaintiffs' property and that the defendants were, therefore, liable for any damages resulting from the plaintiffs' detrimental reliance on that misrepresentation. We disagree.

The trial court determined that "the proof offered by the plaintiffs falls far short of that necessary to sustain their burden" on the issue of misrepresentation and that, on the basis of the evidence, "there were no fraudulent or negligent representations made by the defendants." In support of this conclusion, the trial court noted that the defendants' "failure to close, both at the earlier and later dates, was due primarily to actions of the Dime Savings Bank which, at first, gave the defendants a false sense of security as to their ability to consummate the transaction and then abruptly and without warning effectively prohibited them from doing so."

" 'On appeal, it is the function of this court to determine whether the decision of the trial court is clearly erroneous. See Practice Book [§ 4061]. This involves

a two part function: where the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision; where the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous.' *Pandolphe's Auto Parts, Inc.* v. *Manchester,* 181 Conn. 217, 221–22, 435 A.2d 24 (1980)." *Robert S. Weiss & Co.* v. *Mullins,* 196 Conn. 614, 618, 495 A.2d 1006 (1985).

Whether evidence supports a claim of fraudulent or negligent misrepresentation is a question of fact. *J. Frederick Scholes Agency* v. *Mitchell,* 191 Conn. 353, 358, 464 A.2d 795 (1983); *Miller* v. *Appleby,* 183 Conn. 51, 55, 438 A.2d 811 (1981). Thus, we will disturb the trial court's determination that the defendants made no fraudulent or negligent misrepresentations only if, in light of the evidence and the pleadings on the whole record, such a conclusion could not reasonably have been reached. *Robert S. Weiss & Co.* v. *Mullins,* supra, 619. We conclude that because the defendants' representation that they had the financial ability to purchase the plaintiffs' property was made in reasonable reliance upon the assurances of Dime and Tower and because the defendants kept the plaintiffs informed of their progress in securing financing for the purchase of their property, the trial court reasonably determined that the defendants made no fraudulent or negligent misrepresentations to the plaintiffs.

When the defendants represented to the plaintiffs that they had the financial ability to consummate the purchase of their property, they had a mortgage commitment from Dime in addition to the bank's assurance

that it would not require, as a condition to the mortgage commitment, the sale of the defendants' existing home. In addition, the defendants were negotiating with Tower to secure a bridge loan. In fact, as Alford testified, Tower intended to grant the defendants a bridge loan until Dime opposed a second mortgage of the defendants' existing property. The defendants continuously apprised the plaintiffs of their problems in securing financing for the purchase of the plaintiffs' property. Not until November 11, 1988, when Alford informed the defendants that Dime opposed the second mortgage, were the defendants aware of their financial inability to purchase the plaintiffs' property. Thereafter, the defendants promptly notified the plaintiffs of this fact through their attorney.

The plaintiffs appear to argue that, despite the favorable assurances that the defendants received from Dime and Tower, because the defendants were in the best position to know their financial condition, they should have known that, ultimately, Dime would oppose the bridge loan from Tower. The plaintiffs have failed to apprise us of anything in the record and our search has revealed nothing, however, that suggests that the defendants had cause to disbelieve the representatives of Dime and Tower.[9]

### III

The plaintiffs next claim that the trial court improperly calculated the measure of damages. According to the plaintiffs, the trial court should have included in

---

[9] Although the defendants' credit history revealed a stream of late mortgage payments, because the plaintiffs do not dispute that the untimeliness was a result of a misunderstanding and that, furthermore, the defendants were unaware of this flaw in their credit history until notified by Alford, this evidence does not alter our conclusion that the defendants had no reason to believe that Dime would ultimately oppose the bridge loan from Tower.

the award of damages the amount of the carrying costs incurred by the plaintiffs until November 1, 1989, the date that they sold their property.[10] We disagree.

In response to the defendants' claim that the amount of damages recoverable by the plaintiffs was limited by the liquidated damages provision of the contract, the plaintiffs claimed that the liquidated damages provision had been abrogated by the parties' subsequent modification of their agreement postponing the closing. The trial court rejected the plaintiffs' claim, having determined that, by their subsequent agreements, the parties had merely modified the liquidated damages provision to include the payment of carrying costs. Pursuant to the liquidated damages provision of the contract,[11] therefore, the trial court ordered the defendants

[10] In their brief, the plaintiffs also argue that the trial court should have awarded consequential damages as a result of the defendants' fraudulent and negligent misrepresentation. In light of our conclusion that the trial court reasonably determined that the plaintiffs failed to prove their claim of misrepresentation, we need not decide whether the provision that limited damages for breach of the agreement also limited the amount of damages recoverable by the plaintiffs for misrepresentation.

[11] In its memorandum of decision modifying the judgment, the trial court stated that, by their agreements postponing the closing, the parties had modified the liquidated damages clause of the contract to include the carrying costs associated with the postponement and that such costs had, in fact, been incurred by the plaintiffs and became due as a natural consequence of the defendants' breach. Citing *West Haven Sound Development Corporation* v. *West Haven,* 201 Conn. 305, 319, 514 A.2d 734 (1986), the trial court further stated that "[s]uch damages may be properly awarded to place the plaintiffs in the same position as if the contract were performed." The court then proceeded to award damages in the amount that had been liquidated by the parties. Although it is unclear why the trial court made reference to the contract measure of damages after determining that the parties' agreement contained a valid liquidated damages provision; see *Hanson Development Co.* v. *East Great Plains Shopping Center, Inc.,* 195 Conn. 60, 64, 485 A.2d 1296 (1985) (party may not recover liquidated damages and also recover actual damages); because we must read the decision of the trial court in the context of its entire decision; *Fisher* v. *Fisher,* 4 Conn. App. 97, 100, 492 A.2d 525 (1985); and because we ordinarily resolve any ambigui-

to pay the plaintiffs damages in the amount of $9584.65, which included the $4500 deposit due under the promissory note and the carrying costs of $5084.65[12] incurred by the plaintiffs during the period from October 1, 1988, through November 30, 1988, the final proposed closing date.

The plaintiffs no longer contest the validity and enforceability of the liquidated damages provision and they concede that, by their subsequent agreements, the parties intended merely to modify the provision to include carrying costs.[13] The plaintiffs disagree, however, with the trial court's conclusion that the provision was modified to include only the carrying costs incurred until November 30, 1988, the proposed date of the closing involving the plaintiffs and the defendants. According to the plaintiffs, because payment of the carrying costs "would be the only protection for the plaintiffs in the face of the defendants' breach," the parties must have intended that, if the defendants

---

ties in the trial court's language in favor of the judgment it rendered; *Powel* v. *Burke,* 178 Conn. 384, 391, 423 A.2d 97 (1979); we conclude that this ambiguity in the memorandum of decision does not vitiate the trial court's judgment upholding the validity and enforceability of the liquidated damages provision.

[12] Although the trial court did not expressly include in the award of damages the $5500 that the defendants had paid to the plaintiffs as a deposit, the trial court noted that this amount was "properly due to the plaintiffs." Furthermore, although in their counterclaim the defendants sought return of this deposit, they have not challenged the trial court's implicit conclusion that the plaintiffs are entitled to retain the deposit.

[13] In their brief, the plaintiffs discuss the general rule of damages for breach of contract; see *West Haven Sound Development Corporation* v. *West Haven,* 201 Conn. 305, 319, 514 A.2d 734 (1986); and assert that this measure of damages "should be utilized if the court sees fit to apply [it] to this case." To the extent that the plaintiffs implicitly claim that the trial court should have awarded damages according to the general rule of contract damages, we disagree. It is well settled that a plaintiff may not recover both liquidated damages and actual damages. *Hanson Development Co.* v. *East Great Plains Shopping Center, Inc.,* 195 Conn. 60, 64, 485 A.2d 1296 (1985).

failed to purchase the property, they would pay the plaintiffs' carrying costs until the property was purchased by another buyer.

The intention of the parties in executing a contract is a question of fact. See *Bell Food Services, Inc.* v. *Sherbacow,* 217 Conn. 476, 482 n.7, 586 A.2d 1157 (1991); *Bead Chain Mfg. Co.* v. *Saxton Products, Inc.,* 183 Conn. 266, 274–75, 439 A.2d 314 (1981). Consequently, we will not disturb the trial court's conclusion that the parties intended to include only those carrying costs incurred until the proposed date of closing unless the conclusion is unsupported by the evidence and, therefore, could not reasonably have been reached. See *Robert S. Weiss & Co.* v. *Mullins,* supra, 618–19.

The trial court determined that the parties' modification of their agreement was memorialized in the three letters that Marino sent to Sidor. The first letter states that the plaintiffs had agreed to postpone the date of closing *"upon the following conditions*: Reimbursement as an adjustment at time of closing for their 'carrying costs' in the total amount of $85.33 per day. . . . The per diem shall commence on October 1, 1988." (Emphasis in original.) The second letter provides in pertinent part: *"CLOSING DATE OF OCTOBER 31, 1988 . . .* as per my letter to you dated September 29, 1988, in the event we do close, 'carrying costs' in the amount of $85.33 per day will be collected from October 1, 1988, to date of closing." (Emphasis in original.) The third and final letter provides that "[the defendants] shall pay directly to [the plaintiffs] before November 11, 1988, the sum of $3,400.00, representing 'carrying charges' incurred by [the plaintiffs] for the months of October and November. If said payment is made in full and in a timely fashion, then the closing date is extended to December 1, 1988 . . . ."[14]

---

[14] James McClintock testified that $3400 represented only a portion of the carrying costs incurred from October 1, 1988, through November 30,

Both the second and third letters specify that the plaintiffs and the defendants had agreed that the defendants would pay the carrying costs incurred for the months of October and November, 1988. None of the letters implies that the parties had agreed that the defendants would pay additional carrying costs in the event that they failed to consummate the purchase. The plaintiffs agree with the trial court that the three letters from Marino to Sidor adequately represent the terms of the parties' modification of their agreement. We conclude, therefore, that the trial court reasonably determined that the parties modified the liquidated damages provision to include, in addition to the amount of the deposits, those carrying costs incurred by the plaintiffs from October 1, 1988, through November 30, 1988.

The judgment is affirmed.

In this opinion the other justices concurred.

1988. The defendants have not challenged the trial court's conclusion that, during this period, the plaintiffs' carrying costs totalled $5084.65.