BROOKS A. BENTZ *v.* ANTHONY P. HALSEY ET AL.
(AC 17438)

Spear, Sullivan and Dupont, Js.

Argued February 23—officially released August 24, 1999

*James G. Green, Jr.*, with whom were *James A. Budinetz* and, on the brief, *Anthony J. Natale*, for the appellant (plaintiff).

*Lloyd L. Langhammer*, for the appellees (defendants).

*Opinion*

SPEAR, J. The plaintiff, Brooks A. Bentz, appeals from the judgment of the trial court denying his claim for a recovery of salary that the plaintiff asserts is due to him as an employee of the defendants, Anthony P. Halsey, A. Searle Field and Jon Kodoma. He also claims that the trial court improperly failed to award him damages based on Halsey's breach of an indemnity agreement.[1] The dispositive issue as to Bentz's salary claims on appeal is whether an employer-employee relationship existed between the defendants and Bentz. We conclude that such a relationship did exist and reverse the judgment of the trial court on those issues. We affirm the judgment as to Bentz's sixth issue on appeal.

The trial court found the following undisputed facts. In October, 1988, Bentz was approached by Halsey via Bentz's mother, an acquaintance of Halsey's, to inquire

[1] Bentz claims that the trial court improperly (1) found that the defendants, who signed Bentz's employment agreement as partners, were not personally obligated to Bentz pursuant to the agreement, (2) concluded that an ambiguity existed in Bentz's employment agreement with respect to who would be responsible for paying Bentz's salary, (3) failed to award Bentz damages pursuant to his claim of promissory estoppel, (4) failed to award Bentz damages pursuant to General Statutes § 31-72, (5) failed to award Bentz damages pursuant to his claim based on unjust enrichment and (6) failed to award Bentz damages based on Halsey's breach of an indemnity agreement.

whether Bentz would be interested in discussing business opportunities that Halsey, Field and Kodoma were planning to develop in the transportation industry.[2] In November, 1988, the parties met to discuss generally their business plans. As a follow up to this initial meeting, Bentz sent a letter to Halsey that included, inter alia, his salary requirements. Thereafter, the defendants negotiated Bentz's relocation from Texas to Connecticut. Believing that a general understanding of the scope of the business undertaking had been accomplished, Bentz sent a draft of his employment agreement to Halsey. The defendants made two modifications to the draft: one modification in § 2.20 dealing with incentive compensation and another in § 6.10 dealing with investment opportunities. This modified draft, which also included Bentz's request for vacation pay, became the employment agreement (agreement).

Bentz began performing his obligations under the agreement on March 1, 1989, when he formed Livery Ltd. (Livery), a limousine company. Shortly after Livery was established, Mystic Auto Rental Car Company (Mystic), a franchisee of Payless Car Rental, was also established.[3] Consistent with the defendants' goal of creating a "mini-conglomerate" of related transportation companies, Bentz continued to search for other investment opportunities for the defendants. Bentz's search led to the defendants' purchase of Trans-Star Trucking Company (Trans-Star) in August, 1989. Bentz was thereafter appointed by Field and Halsey[4] to serve

---

[2] The parties' goal was to establish various companies in the transportation industry.

[3] Livery's assets consisted solely of the right to operate limousines in the form of licenses. Other than these licenses, Livery had no assets, operating income or vehicles. Mystic, likewise, had no assets or employees. The defendants personally financed both Livery and Mystic with their own money and with lines of credit that they had secured.

[4] Kodoma did not participate in this venture.

as Trans-Star's chief executive officer (CEO), but continued to oversee Mystic's and Livery's operations. In January, 1990, however, Field instructed Bentz to work exclusively on Trans-Star. In February, 1990, at the specific request of and with an assurance from Field and Halsey that it would be subject to priority replacement, Bentz loaned Trans-Star $35,000 of his own money.[5] Thereafter, at some point during the spring of 1990, Field and Halsey hired David Whepley, an outside consultant, to recommend how to improve Trans-Star's financial situation, and eventually assigned control of Trans-Star to Whepley over Bentz's objections. Whepley, in turn, hired Lester Keck as Trans-Star's chief operating officer. Thereafter, Bentz offered to resign his position as CEO. Field and Halsey requested, however, that he not resign. Bentz continued to work as Trans-Star's CEO through the end of 1990.

All three of these companies were funded exclusively by the defendants with Bentz's salary obligation spread among the companies. This method of payment was Field's idea. For example, in August, 1989, $40,000 of the $50,000 annual salary obligation to Bentz was paid through Trans-Star and the balance equally through Livery and Mystic. This manner of apportioning Bentz's salary continued until May 1, 1990, when Bentz, with the defendants' consent and prior approval, and as a cost saving measure, began taking payments on the $35,000 loan that he had previously made to Trans-Star in lieu of salary. While this loan was being repaid, Bentz's salary was deferred but was accruing at the rate of $50,000 per year, commencing May 1, 1990.[6]

---

[5] At the time of the purchase of Trans-Star, the entity was experiencing severe financial hardship and was on the brink of dissolution with a negative net worth in excess of $600,000.

[6] The majority of Bentz's claim against the defendants relates to unpaid salary from May 1, 1990, through the time Trans-Star closed down.

Bentz agreed to the salary deferral as a means to alleviate the financial burden on Livery, Mystic and Trans-Star. When the payments under this deferral arrangement ultimately fell behind, the defendants agreed to remedy the arrearage.

In December, 1990, Trans-Star was forced to close down its business because Independent Freightway, Inc., terminated its operating agreement with Trans-Star. At the time it closed down, Trans-Star had an outstanding debt to BayBank Connecticut, N.A.[7]

Thereafter, in January, 1992, Bentz learned that his salary accrual was not reflected on the books. Seeking to resolve this issue, Bentz relied on his right to payment of his salary as expressed in the agreement. When approached by Bentz, Halsey never challenged Bentz's right to compensation, nor did he challenge the validity of the agreement. On July 1, 1992, Bentz, Kodoma and Halsey attended a meeting during which Bentz first learned that the defendants were refusing to honor their salary obligation to him.

Bentz filed the present action to recover the salary allegedly due him from the defendants. The trial court concluded that the defendants were not personally liable to Bentz for the salary obligation, determining, inter alia, that there was no evidence that Bentz was an employee, and that the agreement was ambiguous as to which persons or businesses were liable. The trial court further found that because Bentz had drafted most of the agreement, any ambiguities should be construed against him. This appeal followed.

Bentz's claim for salary turns on (1) whether the agreement created an employee-employer relationship

---

[7] In October, 1989, BayBank Connecticut, N.A., had loaned Trans-Star $500,000 on two separate loans. These promissory notes were signed by Bentz, Halsey and Field. The trial court found for Bentz on the counterclaim of Halsey and Field that sought indemnification on the note. The defendants did not appeal that finding.

between Bentz and the defendants and (2) whether Bentz was in fact employed by the defendants pursuant to the agreement. Because these claims are interrelated, we will discuss them together.

The trial court dismissed the agreement as ambiguous as to who was to pay Bentz's salary and noted that Bentz was paid by the various companies that he managed. The trial court also found that there was "no evidence" that Bentz was an employee of the defendants. Bentz claims that the trial court's factual conclusion that he was not an employee of the defendants is clearly erroneous and the trial court's legal conclusion that the agreement was ambiguous with regard to who was responsible for paying Bentz's salary is improper. We agree with Bentz.

"On appeal, it is the function of this court to determine whether the decision of the trial court is clearly erroneous. . . . This involves a two part function: where the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision; where the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous. . . . [*Barbara Weisman, Trustee* v. *Kaspar*, 233 Conn. 531, 541, 661 A.2d 530 (1995)]. [W]e will disturb the trial court's determination . . . only if, in light of the evidence and the pleadings on the whole record, such a conclusion could not reasonably have been reached, given the facts and the law to be applied to the facts. *McClintock* v. *Rivard*, 219 Conn. 417, 427, 593 A.2d 1375 (1991)." (Internal quotation marks omitted.) *Citino* v. *Redevelopment Agency*, 51 Conn. App. 262, 271, 721 A.2d 1197 (1998).

"A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . *United Components, Inc.* v. *Wdowiak*, 239 Conn. 259, 263, 684 A.2d 693 (1996)." (Internal quotation marks omitted.) *In re Michael A.*, 47 Conn. App. 105, 109, 703 A.2d 1146 (1997).

To resolve Bentz's claim, we must determine whether the trial court's conclusion that the agreement is ambiguous is legally correct and whether its finding that Bentz was not an employee of the defendants was clearly erroneous.

We look first at the agreement. It provides in relevant part: "This Agreement is made this first day of February, 1989, by and between Mr. Brooks A. Bentz (*Associate*) and, as a group, Mr. Anthony P. Halsey, Mr. A. Searle Field, and Mr. [Jon] Kodoma (*the Partners*).

"The intent of this Agreement is to specify the arrangements under which *the Partners will retain Associate* during the interval required for the development and implementation of various projects to be mutually agreed upon." (Emphasis added.)

Section 2.10 of the agreement provides: "Base Compensation: *Associate* will receive base compensation at a rate of $50,000 per year, payable semi-monthly." (Emphasis added.)

The trial court found that the agreement was entered into between Bentz, who signed the agreement on the signature line, under which the word "Associate" was written, and each of the three defendants, who individually signed the agreement on the signature line, under which the word "Partner" was written.

In their brief, the defendants point to claimed ambiguities in the agreement regarding its term, the proposed "company-funded IRA," the amount of fringe benefits and business expenses and Bentz's right to participate in investments made by the partners. Conspicuously absent is any claim that the agreement was ambiguous as to the creation of an employee-employer relationship. It is that relationship that gives rise to an employer's obligation to pay an employee's salary.

General Statutes § 31-71a, which governs payment of wages, provides in relevant part: "(1) 'Employer' includes any . . . partnership . . . employing any person . . . [and] (2) 'Employee' includes any person suffered or permitted to work by an employer . . . ." The defendants do not contest Bentz's status as an employee. They claim that he is someone else's employee, not theirs.

We conclude that the parties' unambiguous language clearly created an employee-employer relationship between Bentz and the defendants.[8] "Although ordinarily the question of contract interpretation, being a question of the parties' intent, is a question of fact . . . [w]here there is definitive contract language, the determination of what the parties intended by their contractual commitments is a question of law. . . . When only one interpretation of a contract is possible, the court need not look outside the four corners of the contract. . . . Finally, [t]he court will not torture words to impart ambiguity where ordinary meaning leaves no room for ambiguity." (Internal quotation marks omitted.) *Grass* v. *Grass*, 47 Conn. App. 657, 662,

---

[8] The defendants assert that there is an ambiguity in that the agreement could be interpreted to mean that the companies that Bentz would eventually manage would be responsible for his salary and not the partners. Such an interpretation would fly in the face of the plain language of the agreement, especially considering that at the time the parties entered into the agreement, no such companies had been created or acquired.

706 A.2d 1369 (1998). None of the ambiguities claimed by the defendants goes to the formation of the employee-employer relationship, but rather to the incidents of such relationship such as retirement plans, expense accounts, term of employment, etc.

The trial court agreed with the defendants' claim that the agreement was ambiguous.[9] "[A]ny ambiguity in the contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms." (Internal quotation marks omitted.) Id., 663. The trial court improperly found an ambiguity where none existed.

Next, we look to evidence presented at trial that demonstrates that Bentz was an employee of the defendants. During the cross-examination of Kodoma, the following testimony was elicited in support of Bentz's claim that he was an employee of the defendants:

"[Plaintiff's Counsel]. In February and March of 1989, the Livery is just a shell company, correct?

"[Kodoma]. February and March?

"Q. Of 1989?

"A. Right.

"Q. All it has is licenses, correct?

"A. Right, and a couple of vehicles.

"Q. It has no employees, correct?

"A. No.

"Q. And it has no operating profit?

---

[9] The trial court's memorandum of decision can be read fairly to so conclude. The court stated that the defendants "claim that the agreement is ambiguous as to who would be responsible for paying Bentz's salary" and immediately thereafter stated that "Bentz himself drew the agreement." The court then concluded that any ambiguity should be resolved against Bentz.

"A. No. *That's what we were hiring someone to do.*" (Emphasis added.)

In its memorandum of decision, the trial court stated that "[a]s of August, 1989, Bentz *was working for the defendants, Field and Halsey,* not only as Trans-Star's chief operating officer, but he also continued to oversee [Mystic's] and Livery's operations." (Emphasis added.) The trial court further stated that, at a meeting on July 1, 1992, "Bentz first learned that the defendants were refusing to honor *their salary obligations to him.*" (Emphasis added.) These findings of the trial court as well as a review of all of the evidence leaves us with the firm conviction that the court improperly concluded that Bentz was not an employee of the defendants.

Because we have determined that the trial court's conclusion that Bentz was not an employee of the defendants' partnership was clearly erroneous, we now must determine whether the defendants are liable to Bentz for his unpaid salary. Generally, all partners are jointly liable for debts and obligations of the partnership. General Statutes (Rev. to 1995) § 34-53;[10] see also *Dayco Corp.* v. *Fred T. Roberts & Co.*, 192 Conn. 497, 501, 472 A.2d 780 (1984). The agreement signed by Bentz and the defendants was an employment contract obligating Bentz to perform certain business services for the defendants in exchange for a salary of $50,000 a year.[11]

---

[10] General Statutes (Rev. to 1995) § 34-53 provides in relevant part: "All partners are liable: (a) Jointly and severally for everything chargeable to the partnership under sections 34-51 and 34-52; (b) jointly for all other debts and obligations of the partnership . . . ." Effective July 1, 1997, General Statutes § 34-53 was amended and moved to General Statutes § 34-327 (a), which provides in relevant part: "Except as otherwise provided . . . all partners are liable jointly and severally for all obligations of the partnership unless otherwise agreed by the claimant or provided by law."

[11] The contract was renewable as long as the business projects continued. In fact, Bentz had worked for the defendants for fourteen months when, as a cost savings measure, Bentz's salary went unpaid, accruing at a rate of $50,000 per year, while being repaid the $35,000 loan that he had made to Trans-Star.

Although the partners obviously hoped that the various enterprises would generate sufficient income to cover Bentz's salary, that hope did not materialize and Bentz's salary became an obligation of the partnership. Because, pursuant to § 34-53, partners generally are liable for the debts and obligations of the partnership, it is clear that the defendants are liable to Bentz for his unpaid salary, unless, on further proceedings in the trial court, the defendants prevail on a special defense that would preclude recovery.

Bentz also claims that the trial court improperly failed to award him damages based on Halsey's breach of an indemnity agreement. We disagree. The indemnity agreement, drafted by Bentz and signed by Halsey, provides in relevant part: "You hereby agree to indemnify me and hold me harmless as a guarantor of those obligations from and against all liabilities and expenses, including interest, penalties and reasonable attorneys' fees that I may incur or suffer, which arise or relate to those obligations, specifically two loans to Trans-Star, and one loan to Mystic Auto Rental Corp. by BayBank Connecticut, N.A., (the 'Loans') and one equipment lease covering so-called limousine-coach to Livery Ltd."

Bentz would like this court to construe broadly the language of this agreement to include indemnification for his expenses in defending the counterclaim.[12] We decline to do so because we agree with the trial court that the indemnity agreement covers only liability and attorney's fees that Bentz might incur as a guarantor of certain notes. There is no evidence that Bentz was sued on the guarantee instruments evidencing the Trans-Star or Mystic loans, or had incurred any expense thereon. The trial court properly found that there was no evidence of a breach. Bentz's claim is, therefore, without merit.

---

[12] See footnote 7.

Our conclusions make it unnecessary to address the other issues raised by Bentz on appeal.

The judgment is reversed except as to the denial of Bentz's claim of breach of the indemnity agreement and the case is remanded for further proceedings to consider the special defenses and damages.[13]

In this opinion the other judges concurred.

---

[13] The defendants raised several alternative grounds for affirmance that were presented as special defenses in the trial court. The trial court made no factual findings with respect to these matters because of its factual and legal conclusion that there was no employee-employer relationship here. On this state of the record, we cannot consider affirmance on a fact based alternative ground.

