ALFRED C. BRIGGS, JR., ET AL. *v.*
GEORGE P. BRIGGS
(AC 21890)

Dranginis, Flynn and West, Js.

Argued October 29, 2002—officially released March 11, 2003

*Allan F. Friedman,* for the appellant-appellee (defendant).

*Michael J. Leventhal,* for the appellees-appellants (plaintiffs).

*Opinion*

FLYNN, J. The defendant, George P. Briggs, appeals from the judgment of the trial court awarding the plaintiffs, Alfred C. Briggs, Jr., Nancy Briggs Debolt and Elizabeth D. Briggs, trustee,[1] damages in the amount of $17,286.94. The plaintiffs have filed a cross appeal. On appeal, the defendant claims that the court improperly defined the term "net revenue" contained in the stipulated judgment, disallowing his deductions of mortgage principal and out-of-pocket construction expenses from his gross revenue figures. The plaintiffs, on cross appeal, claim that the court improperly calculated the defendant's net revenue by (1) permitting loss carry overs from one calendar year to another and (2) allowing the defendant, under the judgment, to deduct his obligatory expense payments from his gross revenue figures. We agree with the plaintiffs that the court

[1] One of the original named plaintiffs in this action was Roger T. Briggs. Upon his death, his wife, Elizabeth Briggs, as trustee, was substituted as a party plaintiff. Following her death, but after judgment in this case, on February 5, 2002, Roger Briggs, as trustee, Patricia Briggs, as trustee, and Theresa Bridgman, as trustee, then were substituted as party plaintiffs by the Appellate Court.

improperly calculated their damages when it permitted loss offsets for the entire period of tenancy rather than limiting those offsets against profits to each individual yearly reporting period. Accordingly, we reverse the judgment of the trial court in part on the plaintiffs' cross appeal but affirm the judgment in all other respects.

The following facts and procedural history are relevant to the appeal and cross appeal.[2] Alfred C. Briggs, Sr., now deceased, entered into a ninety-nine year lease agreement with the defendant, his son, on July 18, 1974. The effect of the initial lease was to encumber the premises for ninety-nine years by a term for years at a very modest annual rental. The lease allowed for the use and occupancy of 401 Greenwich Avenue, Greenwich, at a base annual rental of $2400, payable in monthly installments. The lease stated that the defendant was responsible for all expenses associated with the property, including "taxes, utilities, insurance, maintenance, etc." In March, 1977, the lease was modified to include an increase in the rental payment to $3600 per annum effective over eighteen years later. Alfred C. Briggs, Sr., also had given the defendant long-term leases on three additional pieces of Greenwich commercial property, not the subject of these appeals. In April 1975, Alfred C. Briggs, Sr., executed his last will and testament. Paragraph III of the will directed that his estate be divided equally among his five children, Alfred C. Briggs, Roger T. Briggs, Nancy Briggs DeBolt, Douglas M. Briggs[3] and the defendant, George P. Briggs. In

[2] It is noted that the defendant's recitation of the facts cites and relies on the transcript of the trial, which was never filed as part of the appellate record before us. The defendant, however, filed a certificate stating that a transcript was not deemed necessary for this appeal. See Practice Book § 63-4 (a) (3). The plaintiffs filed a similar certificate, but properly rely on the record rather than the transcript for their recitation of the relevant facts. Nevertheless, we do find the record adequate for review. See Practice Book §§ 61-10; 63-4 (a) (3).

[3] Douglas M. Briggs was not a party to this action.

March, 1982, Alfred C. Briggs, Sr., made a first codicil to his last will and testament. Paragraph three of the codicil provided: "It has come to my attention that the real estate which I own in the State of Connecticut is subject to certain long term leases which I have not previously read in detail and which I granted to one of my sons, George P. Briggs. Particularly in view of the remaining duration of such leases, the rental payable thereunder and the value of such real estate in relation to the total value of my anticipated estate, such leases if permitted to continue will serve to frustrate the intentions expressed in my Will of April 11, 1975 to divide my estate equally among my five (5) children, per stirpes.

"Accordingly, in the event of my death, I request that my son, George P. Briggs, agree to the cancellation of such leases as promptly as practicable and, in the event he does not do so, I direct my Executor, in the course of disposing of my estate, to employ all legal and reasonable means to seek to have such leases declared invalid with the objective that the fee simple title to [said] real estate in the State of Connecticut be considered a part of my estate, not subject to such leases, for distribution in accordance with the provisions of my Will. In the event that such leases are not canceled or declared invalid, any distribution made pursuant to Paragraph III of my Will shall be made allocating the value of such leases to the lessee thereunder as a part of the share distributed to my son, George P. Briggs." The codicil also named Roger T. Briggs as executor of the estate of Alfred C. Briggs, Sr.

Following the death of Alfred C. Briggs, Sr., various lawsuits were filed by the executor and the defendant. The parties eventually entered into a stipulated agreement (stipulation) on June 14, 1984, thus ending those lawsuits. Under the stipulation, the parties agreed that a commercial building could be constructed by the defendant, George P. Briggs. Roger T. Briggs, as

executor, consented "to the construction of the pro-
posed commercial building by [the defendant] George
P. Briggs at and upon the 401 Greenwich Avenue real
estate . . . ." The stipulation also provided that the
defendant, George P. Briggs, waived, released and relin-
quished "any and all of his right, title and interest in
and to any distributive share, or any interest, of the
estate of his late father, Alfred C. Briggs, Sr. . . ." Roger
T. Briggs, as executor and landlord, and the defendant,
as tenant, agreed to a reduction in the term of the lease
at 401 Greenwich Avenue from "99 years to 75 years,
thereby terminating on August 1, 2048 rather than
August 1, 2073." The stipulation anticipated that the
defendant, George P. Briggs, would construct a com-
mercial building at 401 Greenwich Avenue, provided
that "these premises will either be leased, used by
George P. Briggs in the operation of an ice-cream store
or some other lawful purpose, or some combination of
the foregoing." The defendant, George P. Briggs, as
tenant, and Roger T. Briggs, as executor and landlord,
also agreed to modify the lease further in a manner that
is at the heart of this dispute.

The stipulation states: "In addition to the rental pay-
able under said lease for the remainder of the term
thereof, as shortened hereunder, George P. Briggs shall
pay to the landlord, on a quarterly basis, 25% of any
and all net revenues generated in his favor by, and/or,
at the building to be constructed at 401 Greenwich
Avenue, irrespective of whether said income is the
result of sub-leasing the same, or any portion thereof,
or business operations conducted by George P. Briggs
himself, his agents, servants or employees, or any cor-
poration or business entity in which he has any interest
whatsoever, at the subject premises. The landlord, upon
sixty (60) days written request, shall have a right to
independent verification and review of income and
expense figures submitted by George P. Briggs, his

agents, servants or employees, in the event of any dispute with respect to same."

Another key portion of the stipulation, which is also the subject of this dispute, states: "The parties hereto agree that the rights and benefits of the landlord (to receive 25% of any and all net revenues generated in favor of George P. Briggs by, and/or, at the building to be constructed at 401 Greenwich Avenue) under and pursuant to paragraph 10 hereof are intended to be in favor of Roger T. Briggs, as executor, and Roger T. Briggs, Douglas J. Briggs, Alfred C. Briggs, Jr., and Nancy Briggs DeBolt individually and personally . . . ."

On June 8, 1988, the defendant and Roger T. Briggs, executor, signed a twenty-year adjustable rate note in the amount of $850,000, with the Putnam Trust Company. The property located at 401 Greenwich Avenue was mortgaged to secure the note, and the defendant constructed a three story building on the site. The defendant leased the property to several residential and commercial tenants and has derived rental income from the property since 1988. Thereafter, the defendant, claiming that he had made no profit on the property, made no payments to the plaintiffs other than the base rent payments. In March, 1994, the plaintiffs filed an action in the Superior Court seeking to collect their portion of the defendant's alleged net revenue, as specified in the stipulation. However, the stipulation did not define the term "net revenues." During the trial, both the defendant and the plaintiffs provided varying definitions of the term "net revenues."

The trial court found that the term "net revenues" was synonymous with "net income" and, taking the annual rental income for the years 1988 through 1999 and, subtracting the annual rental expense for the same

period, determined that the defendant owed the plaintiffs $17,286.94.

## I

The defendant claims that the court improperly defined the term "net revenues" contained in the stipulation and thereby disallowed deductions that should have been allowable when calculating his net revenue. At the outset, we observe that although the defendant repeatedly argues that the court improperly defined the term "net revenues," he also states in his brief that he agrees with the court's definition "100 percent." We conclude that it is not necessarily the court's definition to which the defendant objects; it appears to be, rather, the court's method of calculating his "net revenues/net income" to which he objects. The defendant also argues that although finding the term "net revenues" to be synonymous with the term "net profits," the "court went on to apply its own application of the term to the facts of this case [and its] calculation of damages does not follow ordinary and accepted definitions of 'net revenues' and 'net profits.' "

As a preliminary matter, we observe that as to this claim the defendant misstates the court's finding. He asserts in his principal brief that "[t]he trial court's decision stated that '[t]he court, therefore, determines that, for purposes of this case, the terms "net revenues" and "net profits" are synonymous.' " The court, however, never found "net revenues" to be synonymous with "net profits." Rather, the court specifically found, for purposes of the parties' stipulation, that the term "net revenues" was synonymous with the term "net income."

On the other hand, the plaintiffs, on cross appeal, concede that the court properly defined the term "net revenues" but claim that it improperly deducted some of the defendant's obligatory expenses under the lease

as modified by the stipulation when calculating his net revenue. We disagree with both parties' claims.

We first determine the appropriate standard of review before analyzing the parties' claims. Paragraph ten of the stipulation states that "George P. Briggs shall pay to the landlord, on a quarterly basis, 25% of any and all net revenues generated in his favor . . . ." The term "net revenues" is undefined in the stipulation, and the court found that, although "[t]he parties and their witnesses offered a number of definitions of the term . . . no one was able to testify definitively about the intentions of the parties when the stipulation was originally prepared." The defendant argues that the term is unambiguous and is defined in both Black's Law Dictionary[4] and Ballentine's Law Dictionary.[5] Accordingly, the defendant argues, its construction is a question of law. The plaintiffs argue that the term is obviously ambiguous, and is, therefore, a question of fact. We agree with the plaintiffs.

"At the outset, we note the well settled principles of contract interpretation. 'Although ordinarily the question of contract interpretation, being a question of the parties' intent, is a question of fact . . . [w]here there is definitive contract language, the determination of what the parties intended by their contractual commitments is a question of law. . . . When only one interpretation of a contract is possible, the court need not look outside the four corners of the contract.' . . . *Bentz* v. *Halsey*, 54 Conn. App. 609, 616, 736 A.2d 931 (1999). On the other hand, '[w]hen an ambiguous term is at issue, the trial court can examine the extrinsic evidence to resolve the question of the parties' intent.'

---

[4] Black's Law Dictionary (6th Ed. 1990) defines net revenues as "See Net Income; Net Profits."

[5] Ballentine's Law Dictionary (3d Ed. 1969) defines "net revenues" as "For most purposes, the same as net income."

. . . *Larson* v. *Jacobson*, 38 Conn. App. 186, 190, 659 A.2d 753 (1995).

" 'Contract language is unambiguous when it has a definite and precise meaning about which there is no reasonable basis for a difference of opinion.' *Paul Revere Life Ins. Co.* v. *Pastena*, 52 Conn. App. 318, 322, 725 A.2d 996, cert. denied, 248 Conn. 917, 734 A.2d 567 (1999), citing *Levine* v. *Advest, Inc.*, 244 Conn. 732, 746, 714 A.2d 649 (1998). 'A court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity, and words do not become ambiguous simply because lawyers or laymen contend for different meanings.' . . . *John M. Glover Agency* v. *RDB Building, LLC*, 60 Conn. App. 640, 645, 760 A.2d 980 (2000)." *Rund* v. *Melillo*, 63 Conn. App. 216, 220, 772 A.2d 774 (2001).

Our review of the stipulation supports the plaintiffs' argument that the term "net revenues" is ambiguous. The stipulation, itself, contains no definition of the term, and there is a reasonable basis for differences of opinion as to its exact definition. For example, on the one hand, the defendant argues that "net revenues" encompass such deductions as mortgage principal payments, loans that he made to the business operation and depreciation. On the other hand, the plaintiffs argue that "net revenues" do not include any of those proposed deductions of the defendant, nor does it include the obligatory expenses mandated by the lease. The parties cite no legal authority as to what expenses, as a matter of law, were allowable in calculating net revenues in this case.[6]

---

[6] The court, in its memorandum of decision, also explained differences in testimony concerning the proper method of calculating net revenues: "The first named plaintiff, Alfred C. Briggs, Jr., testified that, to him, 'net revenue' equals gross revenue less commissions paid to real estate brokers only . . . . [The] [p]laintiffs' witness, Clifford Mallo, a licensed [certified public accountant], defined 'net revenue' similarly, but would allow a further deduction for rebated or discounted rent: 'gross revenue less any return to the customer or allowances or in a case of rent it would be the gross rent received less any partial months refunded, or in cases of having agents rent

Discovering no clear interpretation of the term within our body of law or within the stipulation itself, we conclude that the term "net revenues" is ambiguous, as is its proper method of calculation. Accordingly, our review of a court's construction of the stipulation is well settled.

"A judgment rendered in accordance with the stipulation of the parties is to be construed and regarded as a binding contract. . . . Construction of [a term in] such an agreement is an issue of fact to be resolved by the trial court as the trier of fact, and subject to our review under the clearly erroneous standard." (Citation omitted; internal quotation marks omitted.) *Albrecht* v. *Albrecht*, 19 Conn. App. 146, 152, 562 A.2d 528, cert. denied, 212 Conn. 813, 565 A.2d 534 (1989); see also *Barnard* v. *Barnard*, 214 Conn. 99, 109, 570 A.2d 690 (1990); *Ridgefield* v. *Eppoliti Realty Co.*, 71 Conn. App. 321, 328, 801 A.2d 902, cert. denied, 261 Conn. 933, 806 A.2d 1070 (2002).

"The trial court's findings are binding upon this court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole. . . . We cannot retry the facts or pass on the credibility of the witnesses. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it

---

the place it's the net amount of revenue you receive from the real estate broker' . . . . An additional witness for the plaintiffs, attorney John Meerbergen, who represented the estate of Alfred Briggs, Sr., in a summary process action concerning the subject property, testified that income less business expenses would be allowable if the defendant were operating an ice cream store on the property . . . otherwise, 'mortgage payments would be paid, plus taxes, and then there would be a 25/75 . . . percent split' . . . . [The] [d]efendant's witness, James Bassett, a licensed [certified public accountant], believed that the term 'net revenues' refers to 'gross revenue, sometimes referred to as receipts, minus all operating expenses that are attributable to a property. This would include mortgage interest, taxes, insurance, utilities. The IRS allows us to deduct something called depreciation also, and that usually results in a net profit or loss which is distributed to partners or shareholders' . . . ."

. . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Putnam Park Associates* v. *Fahnestock & Co.*, 73 Conn. App. 1, 11–12, 807 A.2d 991 (2002).

We next determine, in light of the foregoing, whether the court's findings were clearly erroneous. The court considered the words of the stipulation and found significant that the stipulation used the term "net revenues" interchangeably with the term "income." This, the court noted, is demonstrated in paragraph ten of the stipulation, which states that the defendant is to pay his siblings "25% of any and all *net revenues* generated in his favor . . . irrespective of whether *said income* is the result of sub-leasing the same . . . " (Emphasis added.) The court then found, for purposes of the stipulation, that the term "net revenues" was synonymous with the term "net income." The court also found that "[d]epreciation expense [should be] disallowed [as a deduction] because, while permissible for [Internal Revenue Service] purposes, it does not reflect actual out-of-pocket payments made by the defendant."[7]

The court went on to calculate the defendant's net revenues on the property for the years 1989 through and including 1999 by looking to the defendant's federal tax returns. To calculate the defendant's net revenues, the court took the defendant's stated rental income for the property, as found on his annual tax returns, and then subtracted his itemized rental expenses, including those obligatory expenses referred to in the lease as incorporated into the stipulation, but excluding depreci-

---

[7] Although the defendant argues that the court improperly disallowed him a deduction for depreciation and principal payments, he points to nothing in the record to support his contention that these are expenses normally deductible in the calculation of net revenues, and we are unable to find support in the record upon our own review.

ation. This method of calculating revenues allowed the defendant to deduct all of the out-of-pocket rental expenses listed on his federal tax returns, with the exception of depreciation, which the court explained was not allowed because it did "not reflect actual out-of-pocket payments made by the defendant." We also note that although the defendant took a deduction each year for depreciation expense on his federal tax returns, he has not established that he owns the building. The defendant, in his second motion for articulation, inter alia, asked the trial court to articulate who would own the building and fixtures at 401 Greenwich Avenue at the end of the lease term; the court, however, declined to so rule because the issue was not raised by any of the parties in their pleadings.

The plaintiffs, on cross appeal, argue that the court should not have permitted the defendant to deduct the obligatory expenses of the building, such as taxes, utilities, insurance, maintenance, etc., because the lease, as incorporated in the stipulation, specifically stated that it was the defendant's sole obligation to pay these expenses. The plaintiffs argue that it is fundamentally unfair to allow the defendant to deduct expenses for which he agreed to be obligated.

In this case, the court specifically found that the itemized out-of-pocket expenses listed on the defendant's federal tax returns, including those obligatory expenses mandated by the lease, were allowable deductions in calculating "net revenues." In its memorandum of decision, the court reviewed the evidence before it and stated that Bassett, a certified public accountant, testified that "mortgage interest, taxes, insurance [and] utilities" were included in the calculation of "net revenues." Additionally, we note that the stipulation, itself, specifically provided that "[t]he landlord, upon sixty (60) days written request, shall have a right to independent verification and review of *income and expense*

*figures* submitted by George P. Briggs . . . ." (Emphasis added.)

Reviewing the evidence and the record provided to us in this case, without the aid of the trial transcript, we conclude that the parties have not established that the court's definition or method of calculating net revenues was clearly erroneous. It is clear from the record that Alfred C. Briggs, Sr., wanted his property to be equally divided among his five children and, after realizing that he had given his son, the defendant, a sweetheart lease that encumbered a large portion of his estate for ninety-nine years, he sought to amend his will to require the executor to use legal means to break the lease with the defendant in an attempt to distribute more evenly the benefits of his estate upon his death.

After reviewing the record, the court's memorandum of decision and its articulations, we are not left with the definite and firm conviction that a mistake has been made. We, therefore, conclude that the court's definition of "net revenues" and its method of calculation in this particular case were not clearly erroneous.

## II

We turn now to the plaintiffs' second claim on cross appeal. The plaintiffs claim that the court improperly calculated their damages by totaling the defendant's rental income for the entire period and then subtracting his itemized rental expenses, thereby arriving at a total for the entire period rather than for each individual yearly period. This method of calculation, they argue, improperly allowed the defendant to carry over or offset losses each year. They argue that because the defendant was to pay the landlords 25 percent of net revenues each quarter, the court should have determined damages on a yearly basis and not allowed the defendant to continue to carry over or offset losses. Because the defendant's tax returns show income and expenses only on a yearly

basis, the plaintiffs concede that the court could not have made a quarterly determination of net revenues, but argue that it should have made yearly determinations and not allowed the defendant to carry over or offset his losses from one year to the next. We agree with the plaintiffs.

"The general rule in breach of contract cases is that the award of damages is designed to place the injured party, so far as can be done by money, in the same position as that which he would have been in had the contract been performed. . . . In making its assessment of damages for breach of [any] contract the trier must determine the existence and extent of any deficiency and then calculate its loss to the injured party. The determination of both of these issues involves a question of fact which will not be overturned unless the determination is clearly erroneous." (Internal quotation marks omitted.) *Sablosky* v. *Sablosky*, 72 Conn. App. 408, 416, 805 A.2d 745 (2002); see also *Ridgefield* v. *Eppoliti Realty Co.*, supra, 71 Conn. App. 328.

"[W]here the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous." (Internal quotation marks omitted.) *Keefe* v. *Norwalk Cove Marina, Inc.*, 57 Conn. App. 601, 609, 749 A.2d 1219, cert. denied, 254 Conn. 903, 755 A.2d 881 (2000).

In this case, although the stipulation stated that the defendant "shall pay to the landlord, on a quarterly basis, 25% of any and all net revenues," the defendant's tax returns provided the court with the necessary information to determine the defendant's net revenues only on a yearly basis. In terms of the defendant's annual

rental income and rental expense, the court found the following for each period:

| Year | Annual Rental Income | Annual Rental Expense |
|------|----------------------|------------------------|
| 1988 | $64,523 | $81,114 |
| 1989 | $108,632 | $104,142 |
| 1990 | $93,845 | $142,116 |
| 1991 | $52,994 | $112,310 |
| 1992 | $80,113 | $98,205 |
| 1993 | $116,765 | $126,573 |
| 1994 | $123,133 | $96,234 |
| 1995 | $127,212 | $85,587 |
| 1996 | $124,198 | $97,275 |
| 1997 | $137,036 | $95,108 |
| 1998 | $136,996 | $90,873 |
| 1999 | $155,983 | $99,696 |

Despite making these specific findings, the court, rather than calculating the net revenues for each period, then proceeded to total each column and subtract the total annual rental expense in column two, $1,229,233, from the total annual rental income in column one, $1,321,430, thus arriving at the total net revenue, $92,197, for the entire period. The court then multiplied this total by the plaintiffs' share of 0.1875[8] to arrive at a damages figure of $17,286.94. This method, however, improperly allowed the defendant to carry over or offset any losses sustained in any individual period.

The stipulation mandated that the defendant pay "on a quarterly basis, 25% of any and all net revenues . . . ." We see nothing in the language of the stipulation to suggest that had the defendant calculated his net revenues each and every quarter, as directed by the stipulation, he would have had the ability to carry over losses

[8] The "landlord" entitled to 25 percent of the defendant's net revenues include the three plaintiffs and Douglas Briggs. Because Douglas Briggs was not a party to this case, the percentage of net revenue to which he was entitled was not part of the court's judgment. Therefore, rather than multiply the total net revenue by 0.25, which would represent the net revenues due to all of the landlords, the court multiplied it by 0.1875, which represented only the plaintiffs' portion of the net revenues.

from one quarter to the next or to offset net revenues in one quarter with losses from another quarter. Rather, our reading of the stipulation suggests that in a quarter in which net revenues were generated, the defendant had the obligation to pay 25 percent of those net revenues to the landlords. In a quarter in which no net revenues were generated, the defendant had no obligation to make any net revenues payment. The court, by totaling the net revenues for the entire period, allowed the defendant to carry over or offset his losses by deducting the losses of one period from the net revenues generated in another period. The defendant points us to no evidence in the record, and our reading of the stipulation does not suggest, that the parties contemplated these offsets. Therefore, we conclude that it was clearly erroneous for the court to go beyond the terms of the stipulation and to award the plaintiffs less in damages than those to which they would have been entitled had the defendant not breached the stipulation. See *Sablosky* v. *Sablosky*, supra, 72 Conn. App. 416 (purpose of damages is to place parties in same position as if contract not breached); *Ridgefield* v. *Eppoliti Realty Co.*, supra, 71 Conn. App. 328 (same).

When asked by the plaintiffs to articulate why the court chose not to calculate their damages per annum, the court responded, inter alia, that it was unable to calculate the defendant's net revenues on a quarterly basis because his income tax returns showed annual income and expenses and that, "contrary to the plaintiffs' assertion that the court should have taken into consideration only the years showing net profit, there is no guarantee, and there was no evidence presented, that those years did not include quarters showing a net loss." We do not agree with the court that a loss in any given quarter would have made a difference in the determination of the net revenues for that annual period such as would be a detriment to the defendant. For

example, if the defendant were to have losses in the first three quarters of a year, followed by net revenues in the fourth quarter, and if the court could have computed these figures on a quarterly basis as the stipulation requires, the defendant would have owed no additional rental payment to the plaintiffs for quarters one through three, but would have owed them payment for quarter four, even if the defendant showed a loss when considered for the entire annual period. Using the court's method of calculation, not only does the defendant not have to pay the plaintiffs for the net revenues earned in a particular quarter, he does not have to pay them for the net revenues earned in a particular annum if he can offset the annual net revenues with a loss from another year.

Although, in this case, the court was unable to calculate the defendant's net revenues on a quarterly basis as directed by the stipulation, the court should have followed the terms of the stipulation as closely as reasonably possible. Here, the court had the defendant's tax returns for each year, and it calculated the gross rental income and the gross rental expense for each year. We conclude that the court, then, acted improperly when it did not calculate the net revenues for each individual year and when it failed to award damages for each year in which net revenues were achieved.

The judgment is reversed on the cross appeal only as to the award of damages, and the case is remanded with instructions to recalculate the damages for each year, without allowing the defendant to offset net revenues in one year with losses from another year. The judgment is affirmed in all other respects.

In this opinion the other judges concurred.