******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************************

# AH MIN HOLDING, LLC *v.* CITY OF HARTFORD
## (AC 44843)

Elgo, Cradle and Norcott, Js.

*Syllabus*

The plaintiff landlord sought to recover damages from the defendant city for the defendant's alleged breach of a tax abatement agreement in regard to certain residential properties the plaintiff owned in Hartford. The agreement provided that the plaintiff agreed to maintain and rent a specified number of dwelling units at the properties for low and moderate income persons or families in order to receive a certain tax abatement. In response to complaints about a variety of deteriorating and hazardous living conditions at the properties, the defendant's housing code inspector, K, conducted several inspections of the dwelling units and discovered numerous housing code violations. K gave the plaintiff notice of the violations and specified a date by which the plaintiff needed to correct them. A few months later, K conducted additional inspections, revealing nearly identical violations as those found previously. K again sent violation notices to the plaintiff, specifying when the violations had to be corrected. Following the second round of inspections, the defendant's tax abatement committee held a meeting, at which it unanimously voted to terminate the agreement. In accordance with the agreement, the committee issued a termination letter to the plaintiff, stating that, if the alleged code violations were not cured within ninety days, the agreement would be terminated. The defendant took the position that after the ninety day period passed without correction of the code violations, the agreement automatically terminated. Several months later, the plaintiff sold the properties, and, as part of the closing, was required to pay the defendant a certain amount of real property taxes. If the agreement had not been terminated, the plaintiff would have had to pay abated taxes in a lesser amount. The plaintiff thereafter sought to collect the amount of the property taxes it claimed to have overpaid due to the allegedly improper termination of the agreement. Following a trial to the court, the trial court found for the defendant on the plaintiff's claims, and the plaintiff appealed to this court. *Held*:

1. Contrary to the plaintiff's claim, the trial court properly read into the agreement certain provisions of the General Statutes (§§ 47a-1 and 47a-7) and the Hartford municipal code (§ 18-2) regarding maintenance obligations in effect at the time of the agreement's formation: this court concurred with the trial court's determination that the agreement was unambiguous and that the plaintiff had a contractual duty to "maintain" the properties, which encompassed the obligation to provide repair and general upkeep to the dwelling units, it was undisputed that these statutory and code provisions were in effect at the time the agreement was formed, they plainly addressed the same subject matter, namely, a landlord's duty to maintain residential rental properties, and, because the obligation to maintain the properties already existed in the express terms of the agreement, importing the statutory and code provisions served only to define the scope of that obligation and did not create a new substantive duty; moreover, the plaintiff's interpretation that the term "maintain" referred only to the continued use of the properties for the purpose of low and moderate income housing, regardless of the condition of such dwelling units, suggested that maintaining the properties allowed the plaintiff to provide housing that did not meet minimum standards of habitability, a suggestion that was patently unreasonable; furthermore, in order to construe the agreement as the plaintiff suggested, there would had to have been an express provision in the agreement to the contrary to relieve the plaintiff of the duties contained in the existing statutory and code provisions, which there was not.

2. This court concluded that, because the trial court properly read the statutory and municipal code provisions into the agreement and the plaintiff cited no additional authority and made no additional argument that the court's factual findings were clearly erroneous, the plaintiff's claims that the court incorrectly found that the defendant had the con-

tractual right to terminate the agreement based on violations of §§ 47a-1 and 47a-7 and § 18-2 of the code, and that the plaintiff failed to prove that the defendant breached the agreement, necessarily failed.

Argued October 17, 2022—officially released February 14, 2023

*Procedural History*

Action to recover damages for, inter alia, breach of contract, and for other relief, brought to the Superior Court in the judicial district of Hartford, where the case was tried to the court, *Hon. Robert B. Shapiro*, judge trial referee; judgment for the defendant, from which the plaintiff appealed to this court. *Affirmed*.

*Kevin J. McEleney*, with whom, on the brief, was *Adam Marks*, for the appellant (plaintiff).

*Laura Pascale Zaino*, with whom, on the brief, was *Michael C. Collins*, for the appellee (defendant).

*Opinion*

ELGO, J. The plaintiff, Ah Min Holding, LLC, appeals from the judgment of the trial court, rendered in favor of the defendant, the city of Hartford, on the plaintiff's claims that the defendant breached a tax abatement agreement (agreement) regarding properties owned by the plaintiff and known as the Clay Arsenal Renaissance Apartments (CARA properties) and that the defendant was unjustly enriched by that alleged breach. On appeal, the plaintiff argues that the court improperly (1) read into the agreement a term that the plaintiff must comply with the General Statutes and certain provisions of the defendant's Municipal Code (code) relating to the maintenance of dwelling units, (2) concluded that the defendant had a contractual right to terminate the agreement, and (3) concluded that the plaintiff failed to prove that the defendant breached the agreement. The defendant argues in response that the court properly read the related statutes and code provisions into the agreement. Further, the defendant argues that, because those provisions properly were read into the agreement, the court correctly determined that the defendant had the contractual right to terminate the agreement because the plaintiff failed to maintain the properties in accordance therewith and that the plaintiff failed to prove that the defendant breached the agreement. We agree with the defendant and, therefore, affirm the judgment.

The following facts and procedural history are relevant to this appeal. The plaintiff formerly owned the CARA properties, thirty-four parcels of residential real property in Hartford. The CARA properties primarily were used as housing for low and moderate income persons and families. On April 15, 2015, the plaintiff, by and through its sole member Emmanuel Ku, entered into the agreement with the defendant, wherein the plaintiff agreed to maintain and rent a specified number of dwelling units for low and moderate income persons or families in order to receive the tax abatement pursuant to the formulae provided in the agreement.

In relevant part, § 7 of the agreement required that "[m]onies equal to the amount of the tax abatement provided for in this [a]greement shall be used by [the plaintiff] solely for one or more of the following purposes:

"a. To reduce rents for the dwelling units on the premises below the levels which would be achieved in the absence of such abatement;

"b. To improve the quality and design of such dwelling units;

"c. To effect occupancy of such dwelling units by persons and families of varying income levels within limits determined by the [state Commissioner of Housing], by regulation; and,

"d. To provide necessary related facilities and services in such dwelling units."

Section 8 of the agreement provided that "[t]he abatement provided for in this [a]greement shall terminate at any time when [the plaintiff] shall cease to maintain approximately 150-156 units of housing solely for low or moderate income persons or families on the premises or when such units cease to fulfill the purposes set forth [in] this [a]greement, provided that such abatement shall not terminate if the [defendant] approves of such cessation or if [the plaintiff] is unable to maintain such units because of fire, act of God, governmental action or any other cause beyond its control, in which event the abatement provided for in this [a]greement shall be adjusted proportionately to the number of such units which [the plaintiff] is then maintaining on the premises." Additionally, the agreement required the plaintiff to permit the defendant's chief operating officer and the state Commissioner of Housing to "inspect the premises at any reasonable time when an abatement is provided pursuant to this [a]greement for any reasonable purpose, including the purpose of determining whether the premises are being used for the purposes set forth in [§] 7 of this [a]greement." If the defendant or its Committee on Abatement of Assessments and Taxes (committee) were to determine that the plaintiff was not in substantial compliance with its obligations under the agreement, the agreement could be terminated following written notice to the plaintiff of such determination and after a ninety day period in which the plaintiff could correct the specified noncompliance.

Prior to February, 2018, the committee received numerous complaints about the living conditions at the CARA properties. These complaints informed the committee about a variety of deteriorating and hazardous conditions, including rodent infestations, unattended to mold in the bathrooms, floorboards coming up, and various additional conditions of disrepair. In response, the defendant's housing code inspector, Kionna Owens, conducted several inspections of dwelling units in the CARA properties throughout the month of February, 2018. Owens discovered several code violations during these inspections and, on March 5, 2018, sent the plaintiff notices of these violations. Each notice included the specific code violations and specified a date by which the plaintiff needed to correct the violations.

In April, 2018, Owens conducted additional inspections, which revealed nearly identical code violations as those found in February. They included a continued rodent and bug infestation; defective appliances and plumbing, including sinks and toilets; peeling paint; water damage and bulges in walls and ceilings; defective or inoperable electrical devices, including smoke detectors and outlets; and inoperable window locks and damaged doors. As a result, on May 30, 2018, Owens again

sent violation notices to the plaintiff and specified that these violations must be corrected by June 30, 2018.

After the April inspections, but before the May 30, 2018 code violation notices were sent to the plaintiff, the committee held a meeting on May 16, 2018, to discuss the status of the CARA properties. During the meeting, the committee unanimously voted to terminate the agreement between the plaintiff and the defendant. On May 25, 2018, in accordance with the agreement, the committee issued a termination letter to the plaintiff, stating that the agreement would be terminated if it failed to cure the alleged code violations within ninety days. The letter stated that the decision to terminate was premised on alleged violations concerning the living conditions in more than eighty dwelling units of the CARA properties. Specifically, the termination letter stated: "It is the strong opinion of the [c]ommittee that your continued failure to provide housing that is sanitary, safe and code compliant constitutes a serious lack of substantial compliance with the [a]greement and a breach of the contract with the [defendant] for which this action is well-grounded." The termination letter included copies of the numerous notices of code violations dated March 5, 2018. At the time of the termination letter, there were approximately ninety-nine outstanding violations of the code and, upon reinspection, forty-five of those violations continued. Those violations were noted as "substantial in nature" and "compromised the sanitary conditions [and] the health of . . . the tenants of the buildings . . . ."

The defendant took the position that after the ninety day period passed without correction of the code violations, the plaintiff's agreement with the defendant automatically terminated.[1] Several months later, on or about November 29, 2018, the plaintiff sold the CARA properties. As part of the closing, the plaintiff paid the defendant real property taxes in the amount of $176,628.15. If the agreement had not been terminated, the plaintiff would only have been liable to pay abated taxes in the amount of $43,500.

On January 23, 2019, the plaintiff filed a two count complaint seeking to recover the $133,128.15 in property taxes it claims to have overpaid due to the allegedly improper termination of the agreement. In count one, the plaintiff claimed that the defendant breached the agreement when it failed to provide a tax abatement for the 2017 grand list and required the plaintiff to pay $176,628.15 in assessed real property taxes when the abated amount would have been $43,500. In so doing, the plaintiff essentially alleged that the defendant improperly terminated the agreement because there was no provision in the agreement requiring it to comply with the code. In the second count, the plaintiff asserted a claim of unjust enrichment because the defendant "unjustly, wrongfully and/or erroneously imposed,

assessed, charged and collected taxes far in excess of the amounts called for under the abatement agreement and the defendant imposed, charged and accepted tax payments, interest and penalties far in excess of the amounts that were properly due pursuant to the abatement agreement." In its answer, the defendant denied the plaintiff's claims of breach of contract and unjust enrichment and asserted a claim for setoff based on fines for the continued violations of the code.[2] A remote virtual trial took place on April 14, 2021, at which the parties stipulated to many of the material facts.[3]

After the trial and posttrial briefing, the court issued a memorandum of decision in which it found in favor of the defendant on both of the plaintiff's claims. In reaching its conclusion, the court found that compliance with the relevant sections of the code must be read into the agreement between the parties. The court, relying on precedent from this court and our Supreme Court, considered the express terms of the agreement as well as any necessary implications arising from the provisions of the agreement. The court specifically stated that, in Connecticut, "[c]ontracting parties are presumed to contract in reference to the existing law, and to have in mind all the existing laws relating to the contract, or to the subject matter thereof." (Internal quotation marks omitted.) Relying on General Statutes §§ 47a-7[4] and 47a-1,[5] as well as § 18-2 of the code,[6] the court further concluded that the law existing at the time of contract formation required the plaintiff to comply with health and safety requirements in the maintenance of the CARA properties. Thus, the court determined that these statutes and code provisions must be read into the agreement.

On the basis of this reasoning, the court found that the plaintiff made no meaningful effort to correct the host of code violations at the CARA properties and that these substantial violations evidenced that the plaintiff's substandard maintenance of the housing units ceased to fulfill the purposes set forth in the agreement. In reaching this conclusion, the court explicitly declined to credit the testimony of the representative for the plaintiff's property management company, Robert Prichard, whose testimony that the plaintiff had approved additional funding to address issues identified by the defendant and that the plaintiff had conducted spot checks regarding repairs of the housing units was not supported by any documentation. In accordance with its factual findings and legal conclusions, the court found that the plaintiff failed to satisfy its obligations pursuant to the agreement and rendered judgment for the defendant. This appeal followed.

I

The plaintiff first claims that the court improperly read §§ 47a-1 and 47a-7 and § 18-2 of the code into the agreement. Specifically, the plaintiff argues that the

agreement's definition of housing for low or moderate income persons or families does not include a requirement that the housing must be completely free of alleged violations of the General Statutes or the code to be considered housing for low or moderate income persons or families, nor does the agreement include a separate provision requiring the landlord to comply with provisions of the General Statutes or the code cited by the court. The plaintiff also relies on General Statutes § 8-215, the statute that forms the basis for the agreement in question, to argue that there was no contractual obligation to comply with §§ 47a-1 or 47a-7 or the municipal code. The plaintiff claims that, because § 8-215 does not expressly incorporate an obligation to comply with §§ 47a-1 or 47a-7 or any municipal code, the court improperly read those statutes and code provisions into the agreement.

In response, the defendant argues that the court properly read §§ 47a-1 and 47a-7 and § 18-2 of the code into the agreement because "a fair and reasonable construction" of the plaintiff's express contractual obligation to "maintain" its properties includes the obligation to complete repairs and general upkeep of the CARA properties. See *Tallmadge Bros., Inc.* v. *Iroquois Gas Transmission System, L.P.*, 252 Conn. 479, 498, 746 A.2d 1277 (2000). The defendant argues that the statutes in effect at the time of contract formation, specifically §§ 47a-1 and 47a-7 and § 18-2 of the code, provide necessary guidance for the required maintenance of low and moderate income dwelling units. Therefore, the defendant asserts that the standards in these statutory and code provisions must be read into the agreement. We agree with the defendant.

We first set forth the applicable standard of review. "Although ordinarily the question of contract interpretation, being a question of the parties' intent, is a question of fact [subject to the clearly erroneous standard of review] . . . [when] there is definitive contract language, the determination of what the parties intended by their commitments is a question of law [over which our review is plenary]." (Internal quotation marks omitted.) *Alpha Beta Capital Partners, L.P.* v. *Pursuit Investment Management, LLC*, 193 Conn. App. 381, 403, 219 A.3d 801 (2019), cert. denied, 334 Conn. 911, 221 A.3d 446 (2020), and cert. denied, 334 Conn. 911, 221 A.3d 446 (2020). On appeal, when the issue of intent is a question of law, "[this court is not] bound by the trial court's interpretation of the contract provision at issue; rather, [this court has] an equal opportunity to consider the words of the contract within the four corners of the instruments itself." (Internal quotation marks omitted.) *Axela New Britain Groups, LLC* v. *LHPB Realty, LLC*, 165 Conn. App. 694, 699, 140 A.3d 296 (2016).

Our interpretation of contract provisions is guided by

well established principles of contract law. "A contract must be construed to effectuate the intent of the parties, which is determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction. . . . [T]he intent of the parties is to be ascertained by a fair and reasonable construction of the written words and . . . the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract. . . . Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms. A court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity . . . . Similarly, any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms." (Internal quotation marks omitted.) *Tallmadge Bros.*, *Inc.* v. *Iroquois Gas Transmission System*, *L.P.*, supra, 252 Conn. 498.

"Contract language is unambiguous when it has a definite and precise meaning about which there is no reasonable basis for a difference of opinion." (Internal quotation marks omitted.) *Briggs* v. *Briggs*, 75 Conn. App. 386, 394, 817 A.2d 112, cert. denied, 263 Conn. 912, 821 A.2d 767 (2003). When determining whether a contract is ambiguous, "[a]ny ambiguity in a contract must emanate from the language used by the parties. . . . The contract must be viewed in its entirety, with each provision read in light of the other provisions . . . and every provision must be given effect if it is possible to do so. . . . If the language of the contract is susceptible to more than one reasonable interpretation, the contract is ambiguous." (Citation omitted; internal quotation marks omitted.) *Cruz* v. *Visual Perceptions*, *LLC*, 311 Conn. 93, 103, 84 A.3d 828 (2014). "[T]he mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous." (Internal quotation marks omitted.) Id.

Bearing in mind these principles of contract interpretation, we concur with the trial court's determination that the agreement is unambiguous. Specifically, we conclude that the plaintiff has a contractual duty to "maintain" the CARA properties, which encompasses the obligation to provide repair and general upkeep to the dwelling units. Black's Law Dictionary defines "maintain," as "[t]o care for (property) for purposes of operational productivity or appearance; to engage in general repair and upkeep." Black's Law Dictionary (11th Ed. 2019) p. 1142. Thus, the ordinary meaning of "maintain" incorporates repair and upkeep. Although the plaintiff argues on appeal that "maintain" refers only to the continued use of the properties for the purpose of low and moderate income housing, regardless of the condition of such dwelling units, the agree-

ment, when viewed in its entirety, does not support a construction that strips the obligation of upkeep and repair from the plain meaning of "maintain." See *Cruz* v. *Visual Perceptions*, *LLC*, supra, 311 Conn. 103. Indeed, § 7 of the agreement specifies the plaintiff's obligations with respect to the upkeep of the CARA properties, which include the duty to "improve the quality and design of such dwelling units" and to "provide necessary related facilities and services in such dwelling units." Section 8 of the agreement also expressly states that, if the plaintiff "shall cease to *maintain* approximately 150-156 units of housing solely for low or moderate-income persons or families on the premises," or if the plaintiff fails to "*fulfill the purposes set forth of this* [a]*greement*," the abatement shall be adjusted proportionately. (Emphasis added.) Further, §§ 9 and 10 of the agreement provide that the plaintiff shall give all assurances that the premises are used for the purposes set forth in § 7 and permit inspection of the premises "*for any reasonable purpose*," including determining whether the premises are being used in accordance with § 7 of the agreement. (Emphasis added.) Thus, the other provisions of the agreement support, rather than subvert, the plain meaning of the term "maintain," which by definition includes repair and upkeep.

Moreover, the plaintiff's mere assertion that we adopt its interpretation of the term in question does not necessitate a finding of ambiguity. See *Cruz* v. *Visual Perceptions, LLC*, supra, 311 Conn. 103. Indeed, the plaintiff's construction suggests that maintaining the properties allows the plaintiff to provide housing that does not meet minimum standards of habitability, which is patently unreasonable. Consequently, we decline to adopt the plaintiff's limited definition of "maintain" and, instead, conclude that the only reasonable interpretation of the contractual term to "maintain" encompasses the duty to repair and upkeep the CARA properties. We therefore conclude that the agreement is unambiguous.

Our Supreme Court has also held that "[t]he law . . . is that statutes existing at the time a contract is made become a part of it and *must be read into it just as if an express provision to that effect were inserted therein*, except where the contract discloses a contrary intention." (Emphasis added; internal quotation marks omitted.) *Deming* v. *Nationwide Mutual Ins. Co.*, 279 Conn. 745, 780, 905 A.2d 623 (2006). When we incorporate a statute as if it were an express term of the contract, we do so in order to "construe the scope or validity of an obligation *already embraced* within the terms of the contract, [but] we do not incorporate the law to create a substantive obligation where none previously had existed." (Emphasis added.) Id., 781. Furthermore, "[a]s a general matter, parties are presumed to have contracted with knowledge of the existing law, and contract language must be interpreted in reference thereto. . . .

*Unless the agreement indicates otherwise*, a statute existing at the time an agreement is executed becomes part of it and must be read into is just as if an express provision to that effect were inserted therein." (Citation omitted; emphasis added; internal quotation marks omitted.) *LMK Enterprises, Inc.* v. *Sun Oil Co.*, 86 Conn. App. 302, 307, 860 A.2d 1229 (2004).

In the present case, we concur with the trial court's determination that §§ 47a-1 and 47a-7 and § 18-2 of the code must be read into the agreement as if an express term to that effect were present. First, it is undisputed that these statutory and municipal code provisions were in effect at the time the contract was formed. These provisions plainly address the same subject matter—the landlord's duty to maintain residential rental properties—and further inform the terms of the agreement, particularly § 7, with respect to rendering necessary facilities and services to the dwelling units. Because the obligation to maintain the CARA properties already existed in the express terms of the agreement, importing §§ 47a-1 and 47a-7 and § 18-2 of the code into the agreement serves only to define the scope of that obligation and does not create a new substantive duty. See *Deming* v. *Nationwide Mutual Ins. Co.*, supra, 279 Conn. 781. Thus, because these provisions existed at the time of contract formation and express an obligation that already existed in the express terms of the agreement, they must be read into the agreement just as if an express provision to that effect were included in the terms of the agreement. See id., 780; *LMK Enterprises, Inc.* v. *Sun Oil Co.*, supra, 86 Conn. App. 307.

In addition, the plaintiff does not dispute that it had the obligation to comply with the requirements contained in these statutory and code provisions at the time it entered into the agreement and throughout its ownership, but nevertheless attempts to argue that the agreement was not formed in contemplation of these statutory and code requirements and, therefore, the maintenance obligations defined by the statutes and code are not tethered to the agreement. As previously discussed, however, § 8 of the agreement expressly includes the obligation to "maintain" the CARA properties, which by definition includes the duty to engage in general repair and upkeep. In order to construe the agreement as the plaintiff suggests, there would need to be an express provision to the contrary to relieve the plaintiff of the duties contained in the existing statutory and code provisions. See *Deming* v. *Nationwide Mutual Ins. Co.*, supra, 279 Conn. 780; *LMK Enterprises, Inc.* v. *Sun Oil Co.*, supra, 86 Conn. App. 307. Here, there is no express provision to that effect. Thus, the absence of a contrary provision further supports the conclusion that these provisions must be read into the agreement to define the scope of the contractual duty to maintain the CARA properties.

Ultimately, the existing statutory and code provisions are consistent with the scope of the plaintiff's existing contractual obligation to maintain the CARA properties, and there is no contractual provision providing that the plaintiff does not need to comply with such requirements. Thus, these provisions must be read into the agreement.

Furthermore, the plaintiff's reliance on § 8-215 does not support the argument that §§ 47a-1 and 47a-7 and § 18-2 of the code were improperly read into the agreement. Although the plaintiff is correct that § 8-215 does not expressly direct a contracting landlord to comply with §§ 47a-1 and 47a-7 and § 18-2 of the code, § 8-215 does provide in relevant part that "[s]uch tax abatement shall be used for one or more of the following purposes: (1) To reduce rents below the levels which would be achieved in the absence of such abatement and to improve the quality and design of such housing; (2) to effect occupancy of such housing by persons and families of varying income levels within limits determined by the Commissioner of Housing by regulation; or (3) *to provide necessary related facilities or services in such housing.* . . ." (Emphasis added.) For the aforementioned reasons, we conclude that the requirement to "provide necessary related facilities or services in such housing" actually supports the conclusion that §§ 47a-1 and 47a-7 and § 18-2 of the code are merely defining the scope of the existing obligation to maintain the CARA properties and, therefore, must be read into the agreement.

In light of the foregoing, §§ 47a-1 and 47a-7 and § 18-2 of the code must be read into the agreement. The plaintiff had the express obligation to maintain the CARA properties, which included the duty to provide repair and general upkeep. The statutory and code provisions in question are consistent with this existing express obligation to maintain the properties, and there is no contrary provision relieving the plaintiff of the duties described in these provisions. We therefore conclude that the court properly read these statutory and code provisions into the agreement.

## II

We next briefly address the plaintiff's second and third claims on appeal. The plaintiff argues in its second claim that the court incorrectly found that the defendant had the contractual right to terminate the agreement based on violations of §§ 47a-1 and 47a-7 and § 18-2 of the code. In its brief, the plaintiff relies on the assumption that, in the absence of the housing maintenance obligations set forth in those statutory and code provisions, the defendant did not have a contractual right to terminate the agreement based on the plaintiff's failure to correct the numerous violations. The plaintiff asks this court to apply the clearly erroneous standard

of review required in breach of contract cases; see *Colliers, Dow & Condon, Inc.* v. *Schwartz*, 77 Conn. App. 462, 471, 823 A.2d 438 (2003); but the plaintiff does not assert any additional grounds to challenge the court's factual determinations with respect to the code violations. Instead, the plaintiff relies solely on its argument that the court improperly read the statutory and code provisions into the agreement to support its claim that the court incorrectly determined the defendant had the contractual right to terminate the agreement. Because we conclude that the court properly read those provisions into the agreement and the plaintiff cited no additional authority and made no additional argument that the court's factual findings were clearly erroneous, the plaintiff's second claim necessarily fails.

Similarly, in its third claim, the plaintiff argues that the court incorrectly found that the plaintiff failed to prove that the defendant breached the agreement. Here, the plaintiff again relies on the assumption that the court improperly read the statutory and code provisions into the agreement and adds that, because the absence of those provisions would deprive the defendant of its contractual right to terminate the agreement for failure to cure the cited violations, the court incorrectly found that the plaintiff failed to prove breach. Again, because we conclude that the court properly read those provisions into the agreement and the plaintiff cited no additional authority and made no additional argument that the court's factual findings were clearly erroneous, the plaintiff's third claim also fails.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The termination letter stated in relevant part that "this termination is effective [ninety] days from your receipt of this notice during which period you have the ability to cure the deficiencies." Testimony from the defendant's corporation counsel, Howard Rifkin, during a deposition in advance of trial, confirmed that this term conveyed that the termination became effective without further notice if the violations were not corrected within ninety days.

[2] The trial court did not consider the defendant's setoff claim and neither party has raised any claims on appeal regarding it.

[3] The following are the stipulations between the parties that were submitted to the court on April 13, 2021:

"a. [The plaintiff] formerly owned the [CARA properties].

"b. On or about April 15, 2015, [the plaintiff] and the [defendant] entered into the [agreement].

"c. On May 25, 2018, the [committee] issued a letter to [the plaintiff] indicating that the [agreement] would be terminated if [the plaintiff] failed to cure alleged [code] [v]iolations within [ninety] days.

"d. [The plaintiff] sold the properties on or about November 29, 2018.

"e. As part of the closing, [the plaintiff] paid the [defendant] real property taxes of $176,628.15.

"f. The [defendant] treated the [agreement] as terminated and required [the plaintiff] to pay the full balance of taxes owed without the benefit of a tax abatement.

"g. If the [agreement] was not terminated, [the plaintiff] would have been liable to pay abated taxes of $43,500. Therefore, the amount in controversy is $133,128.15 before accounting for any alleged setoffs."

[4] General Statutes § 47a-7 provides in relevant part: "(a) A landlord shall: (1) Comply with the requirements of chapter 368o and all applicable building and housing codes materially affecting health and safety of both the state or any political subdivision thereof; (2) make all repairs and do whatever

is necessary to put and keep the premises in a fit and habitable condition, except where the premises are intentionally rendered unfit or uninhabitable by the tenant, a member of his family or other person on the premises with his consent, in which case such duty shall be the responsibility of the tenant; (3) keep all common areas of the premises in a clean and safe condition; (4) maintain in good and safe working order and condition all electrical, plumbing, sanitary, heating, ventilating and other facilities and appliances and elevators, supplied or required to be supplied by him; (5) provide and maintain appropriate receptacles for the removal of ashes, garbage, rubbish and other waste incidental to the occupancy of the dwelling unit and arrange for their removal; and (6) supply running water and reasonable amounts of hot water at all times and reasonable heat except if the building which includes the dwelling unit is not required by law to be equipped for that purpose or if the dwelling unit is so constructed that heat or hot water is generated by an installation within the exclusive control of the tenant or supplied by a direct public utility connection.

"(b) If any provision of any municipal ordinance, building code or fire code requires a greater duty of the landlord than is imposed under subsection (a) of this section, then such provision of such ordinance or code shall take precedence over the provision requiring such lesser duty in said subsection. . . ."

[5] General Statutes § 47a-1 (c) defines a " '[d]welling unit' " as "any house or building, or portion thereof, which is occupied, is designed to be occupied, or is rented, leased or hired out to be occupied, as a home or residence of one or more persons."

[6] At the time the parties entered into the agreement, § 18-2 of the code provided: "No owner shall occupy or let to any other occupant any vacant dwelling unit unless it is clean, sanitary and fit for human occupancy." Hartford Municipal Code § 18-2 (Rev. to January 9, 2015). This section of the code also included the same language, in relevant part, at the time of the defendant's alleged breach of the agreement. See Hartford Municipal Code § 18-2 (Rev. to April 20, 2018).

We note that, currently, § 18-2 of the code provides: "The purpose of this chapter is to promote the public health, safety, and general welfare with respect to housing in the City of Hartford by achieving all of the following:

"A. Enacting citywide standards for clean, safe, and habitable housing to, among other things, promote the general health and well-being of residents, improve indoor air quality, prevent asthma, reduce symptoms of allergies, and minimize the presence of toxic levels of lead.

"B. Empowering city officials to inspect properties to assess compliance.

"C. Clarifying the scope of enforcement authority.

"D. Aligning city ordinance with building code, anti-blight and property-maintenance code, health code, fire code, and the zoning regulations adopted by the planning and zoning commission.

"E. Promoting sustainable practices." Hartford Municipal Code § 18-2 (2022).